**Billy Harold TUCKER and Rebecca Tucker, Plaintiffs,**

v.

**AMERICAN TELEPHONE & TELEGRAPH CORPORATION, Defendant.**

**No. 86–2847–TUA.**

United States District Court, W.D. Tennessee, W.D.

Jan. 29, 1992.

---

James O. Lockard, L. Anthony Deal, Memphis, Tenn., for plaintiffs.

Robert D. Flynn, Memphis, Tenn., for defendant.

## ORDER DENYING PLAINTIFFS' AMENDED MOTION FOR NEW TRIAL

JEROME TURNER, District Judge.

Following trial of this product liability case, a verdict was returned by the jury in favor of the defendant and the plaintiffs filed a motion for a new trial. That motion has now been amended to waive all of the issues submitted on the original motion for a new trial except the issue of whether the testimony of Dr. Wallace Dixon Ward was admitted in violation of the restrictions imposed under Federal Rule of Evidence 601.

Plaintiffs state the issue as: "Did the trial court error (sic) in allowing Dr. Dixon Ward, a physicist and experimental psychologist, to give testimony on the issue of medical causation?" [1]

Dr. Ward is a professor at the University of Minnesota in four different departments, Otolaryngology in the medical school, Enviromental Health, also a part of the medical school, Communication Disorders, and Psychology. As a part of his duties on the medical faculty, he teaches medical students and physicians about hearing and the effects of noise on hearing. He is not, however, a medical doctor himself, nor an audiologist; he has an undergraduate degree in physics and a Ph.D. from Harvard University in experimental psychology which he obtained in 1953. After graduation, he was engaged in a project involving the study of the effect of noise on flight deck personnel in the Navy. In 1957 he became Associate Director of Research for the Noise Research Center of the Subcommittee on Noise for the Conservation of Hearing at the American Academy of Opthalmology and Otolaryngology during which time he conducted experiments on temporary hearing losses from both steady and impulse noises. In 1962 he joined the University of Minnesota as an associate professor where he continued his experiments on the temporary effects of noise on hearing in humans. In 1967 he became a full professor. In the last ten years he has been studying the amount of hearing loss produced with various patterns of exposure with the purpose of determining the relationship between permanent hearing loss and various types of exposures.[2] As chairman of a review committee for the National Academy of Sciences, Dr. Ward has been involved in the development of proposed human exposure standards for impulse noises. He has thus, as the history indi-

1. As will be seen, the plaintiffs' object on the ground that the witness was incompetent to testify under state law. No argument is made by the plaintiffs that the witness's methodology was not well grounded nor that the data he relied upon was not "of a type reasonably relied upon by experts in the particular field...." *Fed.R.Evid.* 703.

2. Because permanent hearing losses cannot be tolerated in human experiments and because the chinchilla has the same number of turns in the cochlea (the inner ear) as the human, these studies have used chinchillas. No question was raised by plaintiffs concerning the reliability of such studies.

cates, sub-specialized within the field of physics since 1953 on the effects of noise on hearing.

Dr. Ward is a member of The American Academy of Otolaryngology, The Acoustical Society of America and other professional organizations; he has authored papers on acoustic trauma to humans and has qualified as an expert in other litigation concerning noise induced hearing loss.

Dr. Ward was not offered by the defendant as a medical expert, nor does he hold himself out as an expert in medicine. He does not treat or examine the human ear in a medical capacity. In the last seven or eight years, he has tested human hearing in connection with his university-approved research on temporary hearing loss using impulses up to 155 decibels.

Over the plaintiffs' objection to his competency under Tennessee law, Dr. Ward testified during this trial in response to a hypothetical questions submitted by the defense.

Q. I am going to ask you to assume certain facts, Dr. Ward. I want you to assume for me that on October the 30th, 1985, at approximately six p.m. that the plaintiff, Billy Tucker, was using the telephone at the front desk of the North Precinct on New Allen Road, Memphis, Tennessee. Assume on that date that the telephone rang and he answered it. Assume that there was no sound or noise on the telephone line when Mr. Tucker answered the telephone. Assume that Mr. Tucker put the telephone to his left ear. Assume that at the time he put the telephone to his left ear, there was still no noise on the line. Assume that Mr. Tucker was able to say, quote, "North Precinct, Patrolman Tucker." Assume that he then claimed to have heard a loud noise or explosion. Assume that he claims to have instantly lost his hearing in both his right and left ears and dropped the telephone. Assume, if you would, Dr. Ward, that Mr. Tucker claims that he was totally without hearing for some thirty to forty-five minutes thereafter, whereupon

his hearing started to return. Assume he was able to finish his shift at the police precinct house that night, ending at approximately Midnight, and during the course of the remainder of that shift, he used his left ear to answer additional calls that evening. Assume he sought medical treatment the next day, and assume that he was diagnosed as having suffered a fistula.

I want you to assume those facts for some questions I am going to ask you in a minute. I want you to assume those facts concerning the way the alleged incident occurred according to Mr. Tucker. I want you to also assume for us in answer to these questions that the telephone allegedly used by Mr. Baker (sic) on that night has been tested both by means of a continuous tone test and a peak impulse test. I want you to assume that it was tested using the standard and required test methodology for testing telephones that the [peak] impulse test were provided results of a peak impulse in one test by one person of one hundred and fourteen db, db is decibel. Assume that a peak impulse in another test by another person using the standard and recognized test methodology showed a one hundred and twenty point five decibel for db peak impulse. Assume that a non-standard, non-recognized peak impulse test, that is a test done in a non-standardized or non-recognized manner, was done on the subject telephone and produced results of a maximum sound pressure level of a hundred and forty-four point five.

I want you to assume those facts for me. Have you got them in your head?

A. Most of them.

Q. Doctor, are those adequate facts for you to base an opinion to a reasonable degree of scientific certainty as to any relationship between those levels of decibels that I have given you and any acoustic trauma to Mr. Tucker?

A. Yes.

Q. And do you have an opinion within a reasonable degree of scientific certainty as to the cause or effect of these

levels that I have just given you as to any acoustic trauma to this individual, Mr. Tucker?

A. Yes.

Q. What is your opinion?

A. That this level was insufficient to cause the hearing loss.

(Transcript of Trial Testimony of Wallace D. Ward, pp. 28–31.)

Q. Doctor, based upon your experiences and your research in a single impulse situation, what is the minimum level, threshold level that in your experience can create, or contribute, or cause an acoustic trauma?

A. Well, those are difficult data to obtain because we don't do this experiment in humans. All I can do is refer to those exposures that have been given deliberately without producing permanent loss. So that all I can base it on are experiments that I have done and that others have done in which successively higher levels have been used until temporary hearing losses appear. And then of course we don't go any higher because it's too hazardous.

Q. These experiments, have you ever participated yourself in any such experimentation?

A. I always bring myself into the experimentation.

Q. And when and where have you conducted such experiments including yourself?

A. Well, at the University of Minnesota and with the Research Center in 1957 and '64.

Q. Did you reach some conclusions or results as to the threshold level that would cause problems in single impulse?

A. We have repeatedly exposed ears to impulses of up to a hundred and fifty-five db. Not everyone, of course.

Some people start showing more effects earlier, but in a study that involved forty-nine different human experiments, subjects, the most sensitive individual started showing temporary hearing losses only when he reached a hundred and forty-two—pardon me—a hundred and forty-three db. And at this point, one person showed some temporary hearing losses and recovered within an hour.

Q. Were all of these effects that you saw temporary in nature?

A. Yes. We always follow and make sure they have recovered the next day.

(Tr. pp. 32–34).

■ Plaintiffs correctly argue in their Amended Motion for a New Trial that in a diversity case such as this is, a federal court is bound to apply the applicable state law in determining the competency of a witness. They rely on *Fed.R.Evid.* 601 which provides:

> Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law.

■ Using this rule plaintiffs take the position that the testimony of Dr. Ward should not have been admitted because he is not a medical doctor, and Tennessee requires that a plaintiff, as a general rule, must prove the causation and permanence of personal injuries by expert medical proof. In other words, plaintiffs contend that the witness was not competent under Tennessee law to testify concerning any opinions that he held relative to the causal relationship between the noise heard by plaintiff and his subsequent hearing loss or acoustic trauma.[3]

---

**3.** Plaintiffs themselves inquired of an audiologist, who was not a medical doctor:

Q. All right. Do you have an opinion, Doctor, based upon a reasonable degree of professional certainty as to at what level of db Mr. Billy Tucker was exposed to result in the type of injuries that you saw on examination and treatment?

A. Well, it would have to be at least a hundred and thirty.

Q. That would be a minimum?

A. As a minimum, but more likely a hundred and forty or above.

Plaintiffs cite two workers' compensation cases: *Mazanec v. Aetna Ins. Co.,* 491 S.W.2d 616 (Tenn.1973), and *Masters v. Industrial Garments Mfg. Co.,* 595 S.W.2d 811 (Tenn.1980).[4] The first of these cases does not deal with causation at all but holds that: "The nature of the injury suffered by employee was such that *lay evidence alone* would not support an award of permanency, and such would require expert medical evidence." *Mazanec,* 491 S.W.2d at 619 (emphasis added). The *Mazanec* court also holds that: "The permanency of the disability, due to the complex nature of the injury, will have to be proven by expert medical evidence." *Id.*

On the other hand, the opinion in *Masters,* relying on *Mazanec,* does deal with proof of causation in a worker's compensation case. It holds:

> It is well settled that except in an obvious case, such as an amputation of a limb or a portion thereof, the employee must establish by expert medical evidence that the injury and disability of which he or she complains was caused by an accident arising out of and in the course of employment.

*Masters,* 595 S.W.2d at 812.

Neither of these two cases nor any other found by the court holds that the testimony of a physician is the only competent testimony that can be admitted on the issue of causation of a physical or bodily condition. Indeed the *Masters* case makes it clear that the need for medical proof on the issue of causation is only a general rule that will not apply in cases where the facts involved do not dictate the need for the expertise of a physician, such as when an amputation is the subject injury and a layman's knowledge is sufficiently relevant to support a finding of causation.

Nor does either of these cases hold that an expert whose expertise is gained from training in a field of scientific knowledge other than medicine is incompetent to assist the trier of fact in determining whether a physical event within his area of expertise, such as the transmission of sound waves, can cause a specified injury to a function of the ear (e.g., hearing). Certainly there are cases where experts trained in medicine[5] may be the only ones who have developed sufficient knowledge of a particular disease to be of assistance to a fact finder. But when the conditions involved are particularly within the education, training and knowledge of a physicist[6] who has spent years studying the effects of noise on the human ear, this court does not believe that the Tennessee courts would hold that such expertise must be disregarded as incompetent because it was not acquired in conjunction with a medical license. Indeed the Tennessee Rules of Evidence provide:

(Trial testimony of Daniel Joseph Orchid)
Like the questions directed to Dr. Ward, these questions inquire into the effect of certain levels of noise on human hearing and the ear. The court comprehends no reason why the audiologist *would be competent on this issue if the physicist is not competent,* inasmuch as neither witness was a medical doctor.

4. Plaintiffs also argue that a psychologist is prohibited by statute from "in any way infringing upon the practice of medicine." Additionally the statute provides that:

> A psychologist ... must not attempt to diagnose, prescribe for, treat or advise a client with reference to problems or complaints falling outside the boundaries of psychological practice.

*Tenn.Code Ann.* § 63–11–204 (1990).
This argument, however, overlooks the witness's extensive training, experience and knowledge in the field of physics which is the basis for his expertise in the subject area of his testimony. Moreover, nothing in this statute prohibits the expression of one's learned opinion, even for compensation in this testimonial context, on the probability that certain outside physical events did or did not result in a given human bodily condition. He may not be qualified to diagnose a patient's physical condition, but that is not to say he may not explain or assess the relationship between sound (a physical event) and a patient's assumed physical condition.

5. Medicine is defined as "the science and art dealing with the maintenance of health and the prevention, alleviation, or cure of disease." *Webster's Third New International Dictionary,* 1402 (1986).

6. Physics is "a science that deals with matter and energy and their interactions in the fields of mechanics, *acoustics,* optics, heat, electricity, magnetism, radiation, atomic structure, and nuclear phenomena." (emphasis added). *Webster's Third New International Dictionary,* 1707 (1986).

"Every person of sufficient capacity to understand the obligation of an oath or affirmation is competent to be a witness except as otherwise provided in these rules or by statute." *Tenn.R.Evid.* 601.

No statute or Tennessee Rule of Evidence has been cited to the court that provides that only a medical doctor may testify on any question of causation of bodily injury. Therefore the admissibility of such a witness's testimony must be judged not by *Fed.R.Evid.* 601, but by Federal Rules of Evidence 401 (relevance), 602 (personal knowledge), 701 (lay opinions), or 702 (expert opinions).

Case law in Tennessee also holds that persons other than medical doctors are competent to testify on issues of injury causation given the proper foundation of personal knowledge or expertise. In *Smith v. Hale,* 528 S.W.2d 543 (Tenn.1975), the court ruled that a chiropractor's opinion as to the cause and effect of the condition of the employee's spine was admissible testimony in a worker's compensation case to support the award made by the trial court.[7] The court noted:

> In *Ward v. N.A. Rayon Corp.,* 211 Tenn. 535, 366 S.W.2d 134 (1962), the court held that a chiropractor is competent to testify as an expert as to matters within the limited scope of his profession. The scope of the profession is defined in T.C.A. § 63–401 as the science of palpating, analyzing, and adjusting the articulations of the human spinal column and adjacent tissues by hand. In *Ward* the court observed that the chiropractor was competent to testify as to the nerve interference in Ward's spine, the subluxa-

tions of his vertebrae, and the abnormal curvature of the spine.

> "... He was also competent to express an opinion as to the probable causes and effects of these injuries." 211 Tenn. at 547, 366 S.W.2d at 139.

*Id.* at 545.

Moreover the Tennessee Supreme Court has noted that: "In 'causal connection' cases, facts and circumstances revealed by lay testimony may often have relevancy upon the ultimate determination of that issue, and therefore it is not exclusively within the realm of medical science." *Owens Illinois, Inc. v. Lane,* 576 S.W.2d 348, 349 (Tenn.1978). It is therefore relatively clear that Tennessee case law does not limit personal injury causation evidence to the testimony of medical doctors.

In this case Dr. Ward was not asked to measure the plaintiff's hearing ability, nor to describe or evaluate the condition of the internal ear itself, nor to diagnose or treat the medical condition of the plaintiff, but to assume a certain condition and hearing ability, as testified to during the plaintiffs' case-in-chief, and to state his opinion as to whether a certain measured level of noise could have had the assumed effect. The effects of noise on the hearing function of the ear has not been shown, nor even argued to be an area outside the intellectual bounds of Dr. Ward's expertise.

Under these circumstances the question of whether to allow the witness to express his opinions as a physicist who has done years of study on the exact subject of the hypothetical question asked of him is not one of competence under *Fed.R.Evid.* 601, but a question governed by *Fed.R.Evid.* 702.[8] This rule provides:

---

**7.** Plaintiffs' argument has been that only a medical doctor is competent to testify on personal injury causation issues, but it might be argued that non-medical doctors, who practice health arts, such as a chiropractor, can meet the case requirements for "expert medical proof" within their realm of expertise. This court, however, believes that the Tennessee courts originally were referring to medical doctors when the requirement for expert medical proof developed in the case law and have simply recognized that experts other than medical doctors may be competent and relevant on the issue of personal injury causation.

**8.** Plaintiffs rely on the case of *Ralph by Ralph v. Nagy,* 749 F.Supp. 169 (M.D.Tenn.1990), in which Judge Wiseman held in a diversity suit that *Fed.R.Evid.* 601 required that two New York doctors be excluded from testifying as experts on causation in a medical malpractice action based on Tennessee law. The issue in *Ralph,* however, turned on the requirements of *Tenn.Code Ann.* § 29–26–115 (1980), a statute that specifically provides:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.[9]

In this court's opinion the witness was well-qualified to express opinions on the subject of his testimony and his testimony was within the range of substantial assistance to the jury, the trier of fact in this case.[10]

Since Tennessee law does not render Dr. Ward incompetent to testify, the motion for a new trial, as amended, is denied.

IT IS SO ORDERED.

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;
(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.
(b) No person in a health care profession requiring licensure under the laws of this state shall be *competent* to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case.... (emphasis added).
The statute itself thus declares that in medical malpractice actions expert witnesses who do not reside in Tennessee or a contiguous state are not "competent" to testify. Because of the statutory restriction, *Tenn.R.Evid.* 601 would preclude such testimony as incompetent in a state lawsuit and thus *Fed.R.Evid.* 601 would require that the witness be excluded as incompetent in a diversity action. Tennessee statutes, however, do not have the same competency requirements for experts in other types of personal injury cases, nor does the apparent motivation of the legislature to avoid excesses in the malpractice area when it adopted the medical malpractice testimonial restrictions apply in the more common and routine types of personal injury cases. Thus the *Ralph* case is not applicable to this case.

9. The only difference between *Fed.R.Evid.* 702 and its comparable provision in the Tennessee Rules of Evidence is that the Tennessee Rule requires that the aid to the trier of fact be substantial.

10. "The decision to allow a witness to testify as an expert is largely within the discretion of the trial court...." *Davis v. Combustion Engineering, Inc.,* 742 F.2d 916, 919 (6th Cir.1984).